UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

| | | |
|---|---|---|
| Anthony Jordan Barnes, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIV. ACT. NO. _____ |
| | ) | COMPLAINT |
| Todd Brown, a person acting under color | ) | DAMAGES |
| of law as an officer with the Columbia | ) | INJUNCTIVE RELIEF |
| County Sheriff's Department | ) | JURY TRIAL REQUESTED |
| | ) | |
| Columbia County, Georgia | ) | |
| through Commissioner Chair Ron Cross | ) | |
| | ) | |
| Captain Donna Dunham or the official in | ) | |
| charge of the office of professional | ) | |
| standards as of June 26, 2015, a person | ) | |
| acting under color of law as an officer with | ) | |
| the Columbia County Sheriff's | ) | |
| Department, | ) | |
| | ) | |
| Tiffanie Smithwick, a person acting | ) | |
| under color of law as an officer with | ) | |
| the Columbia County Sheriff's | ) | |
| Department, | ) | |
| | ) | |
| Clay Whittle, individually and in his | ) | |
| official capacity, under | ) | |
| color of law, as the Sheriff | ) | |
| of Columbia County | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

COMPLAINT

COMES NOW, Plaintiff, who shows the Court the following:

Jurisdiction and Venue

1.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) because

    this action asserts one or more deprivations of federal constitutional rights under color of

1

law, which is remediable under 42 U.S.C. §§ 1983 and 1985(3), to provide remedial relief of

damages for injury caused by the deprivation of federal rights and for prospective injunctive

relief to prevent future deprivations.

2. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over claims under

Georgia law because the facts supporting the state claims arise from the same or similar facts

supporting and form at least part of the same case or controversy under Article III.

3.   Venue is proper within the Augusta Division because the challenged incident occurred in

Columbia County, and one or more of the defendants resides within Columbia County, which

is in the Augusta Division.

Parties

4.    Plaintiff incorporates each and every allegation above as if fully stated herein.

5.    Plaintiff Barnes, is a male adult who routinely in the past, and will with reasonable

certainty in the future, drive on the highways in Columbia County because his family and friends

live in the area and he therefore exercises his rights to freely associate and to travel, and he will

be seen and observed by Defendants while driving on the highway of Columbia County and

subject to their traffic stops.

6.    Deputy Tiffanie Smithwick is sued individually for actions and inaction taken under color

of, though not necessarily within the law, as an officer with the Columbia County Sheriff's

Department.

7.    Deputy Todd Brown is sued individually for actions and inaction taken under color of,

though not necessarily within the law, as an officer with the Columbia County Sheriff's

Department.

8.      Captain Donna Dunham or the official in charge of the office of professional standards as of June 26, 2015, is sued individually for actions and inaction taken under color of, though not necessarily within the law, as an officer with the Columbia County Sheriff's Department.

9.      Clay Whittle, is sued individually and in his official capacity for actions and inaction taken under color of, though not necessarily within the law, as the Sheriff of and a policy maker, with the Columbia County Sheriff's Department, as to the supervision of subordinate deputies and supervisors, to prevent practices and customs which are deliberately indifferent to deprivations of federal rights, such as unlawful arrests, disregard of cover-up and manipulation of information provided by officers to superiors about challenged conduct, resulting in meaningless review and ratification of deprivations of rights.

10.      Defendant Columbia County is sued through Ron Cross, in his official capacity, as the Chair of the Columbia County Commissioners, along with Commissioners Doug Duncan, Trey Allen, Gary L. Richardson, and William D. Morris in their official capacities as Commissioners for policies, practices or customs that are deliberately indifferent to prevention of deprivation of citizens' rights, endanger the safety of officers such as by the failure to provide body cameras, audio and video and a meaningful distribution and number of dash cams for officer's vehicles.

11.      The Defendants Sheriff Whittle and Columbia County have a policy or practice of not providing body cameras and provide only a limited number of dashboard cameras for patrol vehicles, and this policy or practice is in deliberate indifference to the strong likelihood that information in reports by officers about incidents in which there is a possible deprivation of rights is in conflict or is inadequate in comparison to the information a reasonably objective and law abiding supervisor would seek from other readily available information or recorded audio and video information, where such audio and video equipment is a known and long-standing

reasonable, efficient, effective and readily-available remedy to prevent cover-up of the truth by subordinate officers of possible deprivations, that will continue to endanger and cause the deprivation of the rights of citizens, endanger officer safety and render review of the acts of citizens and officers by courts needlessly inefficient and expensive, undermining due process and equal protection on the streets and through the courts.

12.     Plaintiff alleges that the policy and practice of not providing readily available audio and video cameras or devices of the Defendant Sheriff and County, caused Plaintiff to be subjected to one or more deprivations of rights protected by the Fourth and Fourteenth Amendments to the U.S. Constitution and will with foreseeable certainty subject Plaintiff to a substantial risk of other unlawful arrests, in deprivation of one or more protected rights.

13.     All of the Defendants who are sued individually are sued for damages, and are sued individually and jointly, for proximately causing one or more deprivations of rights and injuries to Plaintiff.

14.     Defendants Sheriff Whittle and the Commissioners are sued in their official capacities for prospective injunctive relief that provides reasonable and truthful investigations of allegations of deprivations of citizens' rights by requiring Defendant Sheriff Whittle and the County Commission to provide and mandate the use of cameras (audio and video) on the officer and in the cars, to allow to meaningful review by superiors, to use as a basis for training, discipline and termination, in an efficient and effective way, which will provide and preserve truthful evidence about the lawfulness of arrests, the reasonableness of force, and address abuses and subterfuges that lead to false arrest, that will lead to better training, and more truthful and safer interaction between police and citizens, in an effort to minimize the unnecessary use of force.

Facts

15.    Plaintiff Jordan Barnes, son of Jennifer Barnes, was 20 years old.

16.    Jordan has PTSD and anxiety issues, and during the morning of June 24, 2015, he had taken his last Klonopin, for anxiety, and initially refused to go to the hospital to see a doctor to get meds.

17.    Jordan had driven the short distance to his brother's house and was so anxious about the absence of his medication that Jennifer Barnes called the Columbia County Sheriff's Department for assistance.

18.    Jordan also has a serious speech impediment of slurring words, which derives from inherited calcium defect in teeth, which break, and as a result son is missing teeth, which impacts speech.

19.    An officer goes to the brother's house, checks Jordan and calls Jennifer and says he is calm, they can't arrest, so officer "clears" him to leave house.

20.    Jennifer was concerned so she drives the short distance to the brother's house and convinces Jordan to go with her to hospital to see doctor, to get anxiety medication, if she goes to store and gets him some cigarettes, which calms him down, which he will smoke on way to, and while at hospital waiting to be seen.

21.    Jennifer gets Jordan's driver's license and the empty medicine bottle, which will be used at intake at the hospital.

22.    Jennifer drives to the nearby store and is headed back to the brother's house and sees Jordan's car on side of road with Officer Brown.

23.    Jennifer is called by dispatch, and connected to Officer Brown.

24.    Brown asks if she still wants to press charges.

5

25.     Jennifer says that she was told he was clear to leave, asks why was her son stopped, and can she come to the scene to give the officer the driver's license.

26.     Initially officer says no, but shortly thereafter says yes, so she drives to the scene.

27.     Jordan is out of car and is calmly talking to the Officer Brown.

28.     Jennifer gets out of her car and gives officer Brown the license and Jennifer gets back in the car.

29.     Officer Brown is told about the speech impediment and Jordan running out of Klonnopin.

30.     Officer also tells Jennifer how compliant Jordan has been.

31.     Officer Brown calls the department to have DUI investigators get involved.

32.     Officer Smithwick arrives and comes to where the three are calmly talking.

33.     Officer Smithwick takes Jordan to the front of her car and g begins the DUI test.

34.     Officer Smithwick instructs Jordan to stand up straight, put his arms out and touch his nose.

35.     Jordan gets in the position and starts trying to comply, and she starts yelling at him.

36.     Jordan is trying to comply and is trying to talk to her, but because of his slurred speech she is gets louder and more angry.

37.     Officer Smithwick continues to re-test Jordan and is yelling at him.

38.     Mrs. Barnes was 10-15 feet away and can hear Jordan slurring his words, so she gets out and stands at her car, and tells Officer Smithwick that Jordan has a speech problem.

39.     Officer Smithwick yells at Barnes to get back in her car, even though Officer Brown has told Mrs. Barnes that she can be at the same, that she is still talking to him and he has not objected to her being out of her car, and even though Mrs. Barnes is not moving toward Officer Smithwick.

40.    Mrs. Barnes gets back in her car.

41.    Without resistance from Jordan, and with hasty and aggressive movement, Officer Smithwick ordered Barnes to put his hands behind his back, and Ofc. Smithwick put cuffs on Barnes' wrists and hands, and then she put him in the back seat of her patrol car, that appeared to be relatively new.

42.    Officer Smithwick shut the car door, but she left the windows up and did not have the air-conditioning on, and the temperature was in the upper eighties.

43.    Although it would have only taken 10 to 20 seconds, Ofc. Smithwick had not consulted with Ofc. Brown about what he knew about the mental condition of Plaintiff, although upon information and belief she had been trained, or should have been trained, to make such an inquiry.

44.    Ofc. Smithwick then aggressively left her car and came to where Ms. Barnes was standing and began to yell at her about how this was her domain, when the police are there they are in charge, that Ms. Barnes should do what she tells you, even though Ms. Barnes was doing exactly what Ofc. Brown had told her to do.

45.    As Ofc. Smithwick approached Ms. Barnes as she sat in her car, Ms. Barnes noticed the aggressive approach of Ofc. Smithwick, and in an attempt to prevent an adverse reaction by Ofc. Smithwick, Ms. Barnes put her keys on the dashboard and put both hands on the steering wheel and intentionally took a non-aggressive, nonthreatening posture.

46.    Ms. Barnes had previously been an EMT and was aware of concerns of officers at arrest scenes and did not want to cause any possible threat to Ofc. Smithwick.

47.     Ofc. Smithwick yelled at Ms. Barnes for about 3 to 5 minutes, and Ms. Barnes kept telling her that she understood, and eventually Ms. Barnes told Ofc. Smithwick that she had been an EMT for five years.

48.     Ofc. Smithwick paused for a moment and looked taken aback and then ran to her car.

49.     Ofc. Brown and Ms. Barnes began talking again and Ofc. Brown was telling Mrs. Barnes how Jordan had complimented him on being the nicest officer he had met, to which Ms. Barnes responded that Jordan doesn't normally pay complements.

50.     Ms. Barnes heard a commotion and looked over at Ofc. Smithwick's car, and saw that Jordan had apparently hit his head on the plastic screen between the front seat in the back seat, causing a wound to his forehead.

51.     Ms. Barnes would later learn that while Ofc. Smithwick was over yelling at Ms. Barnes, Jordan became hot and began to feel suffocated, because Ofc. Smithwick had left the windows up, and so out of anxiety and frustration he banged his head on the plastic screen causing the superficial head injury.

52.     Then Ms. Barnes saw that Ofc. Smithwick had taken a towel and had it in her hand and was pushing it on Jordan's head and face.

53.     The commotion was caused by the fact that Jordan felt like he was being smothered and was telling Ofc. Smithwick to take the towel off so that he could breathe and he was moving his head back and forth to free his face from the towel.

54.     Ms. Smithwick was yelling at Jordan and still trying to keep the towel on his face and head.

55.     It appeared that Ofc. Smithwick was concerned about the blood in her vehicle, which was causing her to overreact using the towel to smother Jordan, which is based on  the fact that after

the EMTs had arrived and had taken Jordan away Ofc. Smithwick immediately began to ask for alcohol swabs clean up any blood.

56.    Ofc. Smithwick then pulled Jordan out of the car and had him sit on the ground with his legs crossed.

57.    Jordan was compliantly sitting on the ground with handcuffs on, and then Ofc. Smithwick began putting the towel back on Jordan's head and face.

58.    Jordan tried to shake his face out from underneath the towel, so he could catch his breath.

59.    Jordan kept telling Officer Smithwick to get the towel off his face, that he did not want the treatment.

60.    With the towel over his face Jordan would move his head around and then gasp for air, and try to get his face away from the towel.

61.    Officer Smithwick persisted putting the towel on Jordan's face for more than a minute.

62.    Then Jordan tried to stand up, to get his face away from the towel.

63.    Officer Smithwick then forced him back down into the sitting position with his legs crossed.

64.    With Jordan's legs crossed, and sitting on the ground, and his hands cuffed behind his back,  Officer Smithwick pushed on Jordan's head and shoulder, with one hand on his head and one on his shoulder, pushing Jordan's face and torqueing Jordan's shoulder, to one side as his torso was solid and in one place.

65.    Officer Brown saw this and headed to Jordan and Officer Smithwick.

66.    Officer Brown then piled on the two of them, while Officer Smithwick had torqued Jordan's torso so that his face on the ground to the side of torso.

9

67.    With Jordan's hands cuffed behind his back, his shoulder was under great stress.

68.    The stones on the ground were hot and burned and Jordan complained about that.

69.    Mrs. Barnes saw Defendant Ofc. Brown look up at her, and she saw Ofc. Brown's face go white.

70.    Mrs. Barnes screamed to the officers that she wanted an ambulance and she wanted one now.

71.    Officer Smithwick pushed the ambulance call button on her collar radio.

72.    The ambulance pulled up, Jordan was transferred to the EMT's.

73.    As Jordan went past Ms. Barnes as he was being taken to the ambulance, he said they had broken his shoulder.

74.    Officer Brown then came over and said he thought that Jordan's shoulder had popped out of place or maybe it was broken.

75.    Now that the towel was out of his face Jordan was not panicked, but he looked in shock and bewildered.

76.    Jordan had a gash on his forehead, but nothing that warranted having the towel being held over his entire face, or nose.

77.    Ofc. Smithwick began asking for paper towels and she was being given cavicide wipes by the EMTs, and she was busy trying to clean her new car of the blood,

78.    Mrs. Barnes offered Ofc. Brown and Ofc. Smithwick alcohol gel and spoke calmly to them, and asked them what she should do.

79.    Officer Brown asked if she could take Jordan's vehicle home, and she was told to do it now.

80.    Troy Shafer, Mrs. Barnes' boyfriend, and at whose house she and Jordan lived, had

been at the scene part of the time, and after Jordan had been taken by the EMTs, Mr. Shaffer

had gone to the store to get Mrs. Barnes a drink, while Ms. Barnes talked to the officers.

81.     When Troy returned, he followed Ms. Barnes, who drove Jordan's truck to the house,

and then Mrs. Barnes and Troy came back to the scene.

82.     When Mrs. Barnes returned there was another officer's car there, and Ms. Barnes

approached a male officer, who may have been Lt. Wimmer, and she asked how to get the

police report or the police report number.

83.     The male officer said to go to the hospital, and that "she," presumably referring to Ofc.

Smithwick, could give it to o her.

84.     Ms. Barnes drove directly to the hospital.

85.     Ms. Barnes had been told that Jordan would be taken to MCG or GRU, so they went

there.

86.     When Ms. Barnes arrived at the MCG emergency room, the officers were not there.

87.     Dr. Sinex, the ER doctor, got her attention and stated the "police left. His shoulder is

not fractured, it is brutal[l]y shattered. They dropped [him] and left."

88.      The doctor restated , "You don't understand.  It isn't a small break, it is brutally

shattered."

89.     Mrs. Barnes asked the doctor if he could show her the x-ray.

90.     The doctor said that even though they were busy, that he would show her the x-ray,

because the injury was very bad.

91.     The x-ray did not show a clean break, but a shattered clavicle, and pieces were even

turned upright and embedded into the muscle.

92.     Mrs. Barnes located Jordan who was sitting with no handcuffs and no monitoring by

any officer.

93.    He appeared to be in shock.

94.    He told Mrs. Barnes that he had been honest, that he did what they had said, and that Officer Smithwick had put him in the hot car with no air.

95.    Jordan said he could not breathe and was screaming for a window to be cracked or to have air on.

96.    Jordan told the officers repeatedly that he had broken another tooth the night before and he couldn't talk right.

97.    Jordan asked his mother, had she not heard him.

98.    Ms. Barnes said no she couldn't hear Jordan, because Ofc. Smithwick had been screaming at her.

99.    Mrs. Barnes thought that Jordan had just hit his head and it was a simple cut.

100.    Because the swelling was so bad, Jordan had to wait for the swelling to go down, and was told to do  follow up with an orthopedic specialist.

101.    Jordan had to wait a month before he could have surgery.

102.    During the wait, his shoulder became infected.

103.    The surgery repaired what could be repaired but the doctors would not remove a piece of bone that was deeply imbedded next to Jordan's main artery and a nerve.

104.    The bone was left and routinely observed by Dr. Rosenbloom.

105.    Three weeks after the incident Mrs. Barnes went to get any report from the Columbia County Sheriff's office, only to be told that no incident report had been filed.

106.    Although Mrs. Barnes and Jordan asked the Sheriff's Department for Jordan's license, a deputy told us someone had looked, but they did not have it.

107.    The officer told Mrs. Barnes to check with the hospital or EMS, which was done, but no report was there.

108.    The hospital did not have the driver's license.

109.    The insurance card was back in his truck.

110.    The only documentation Mrs. Barnes had seen on the event was with the EMS, which stated that EMS was called to check a person under arrest and in handcuffs, and that after being injured, officers dropped the charges.

111.    In the use of force report in the Barnes case, by Officer Brown. he says that he, not Smithwick,  opened the back door of the car and noticed that Barnes had "pulled his arms around his legs.  That Brown tried to assess the wound to the head.  Brown says that Barnes "began swinging his arms at Brown.  Brown says he pulled Barnes from the vehicle and onto the ground. Brown claims that he and Smithwick continued to give commands for Barnes to stop resisting. Brown claims that Barnes continued to resist on the ground by pullng his arms underneath him, and tha Brown was able to get him up and into a seated position, when he noticed hew had an injury to his left shoulder and the EMT's were called.

112.    Lt. Wimmer, a Captian, Major Rick Whitaker presumed based on counsel's reading of the signature, Chief Deputy Ciamillo and Sheriff Whittle all concluded that the use of force was justified, but there was no interview of Jennifer Barnes, Jordan Barnes or Troy Shaffer.

113.    There were no charges filed.

114.    The officers dropped Jordan at GRU and left.

115.    The reviewing supervisors made no inquiry about how serious the injuries were or why Jordan was arrested in the first place.

116.    No inquiry was made about the head injury and being smothered Jordan being smothered by the towel.

117.    Although Jennifer Barnes sought reports she was not even given the use of force report.

118.    There is no report by officer Smithwick.

119.    In a separate case filed in January 2015, Hobbs v. George Lee, et al., S.D. Ga., Civ. Act No. 1:15-cv-00010,  it was alleged that deputies with the Columbia County Sheriff's department withheld material information from Incident and Use of Force reports, such as the seriousness of injuries caused to citizens, as to an incidents that occurred on January 19, 2013; that supervisors up through and including the Sheriff, customarily overlook obvious discrepancies in reports and make no effort to interview citizens about incidents of possible officer malfeasance; causing a custom whereby deputies act with greater force than necessary, continue to cover up excessive force and initial officer malfeasance, that leads to foreseeable and justifiable reaction by citizens that is then used by officers to justify force and excessive force by officers that would not be necessary, but for the officer's original malfeasance; where superiors' lack of reasonable inquiry or inquiry that is deliberately indifferent creates a custom of unconstrained malfeasance and excessive force perpetuated by paperwork that is created to cover up past malfeasance.

120.    In the written reports in Hobbs, Officer Smithwick indicates only that Mr. Hobbs indicated that his eye hurt, that it was swollen and bleeding.

121.    Officer Smithwick concealed the fact that Lee hit Hobbs in the eye with his fist when it was unreasonable to do so.

122.    Smithwick did not report that Officer Lee had hit Hobbs in the eye when Hobbs was under the control of Smithwick and Officer Thacker.

123. In the written reports in Hobbs, Officer Thacker does not even mention that Lee hit Hobbs in the eye.

124. The alleged concern of the officers was to get Hobbs' hands.

125. Officer Thacker did not even consider using fists to hit Hobbs in the head.

126. The booking photo shows that Hobbs' eye is completely shut and swollen

127. In the investigation, no supervisor, including the Sheriff asked the officers whether it was necessary for Lee to hit Hobbs with his fist in the eye.

128. Several supervisors and the Sheriff determined that the use of force against Hobbs was justified.

129. Defendant Sheriff acknowledged service of that complaint in April 2015.

130. The Sheriff does not have a system in place by which there is investigation of possible excessive force, or officer malfeasance that leads to excessive force, by interviewing citizens and non- officer witnesses about their versions of events, a system that verifies the seriousness of the injury and compares it to officers' reports of the injury or that asks specifics as to what preceded the injury.

131. The Sheriff does not have body cameras on officers.

132. The Sheriff has limited dash cameras in the vehicles.

133. The Sheriff does not have a system in place whereby officers routinely and without retaliation report possible uses of excessive force, and inquiry is made.

134. The Hobbs case put Defendants Sheriff Whittle and Captain Dunham on notice, at least by April 2015, that deputies ware leaving out material information about deprivation of citizens' rights in use of force and incident reports.

135.    The Sheriff and Captain Dunham continue to place cover of officers for defense from civil liability above protection of the public's interest in protection of constitutional rights by deliberately failing to cause more rigorous investigations to be instituted.

136.    Appropriate and balanced investigations could be done more efficiently through the use of body cameras, which would also make defense of officers whose actions are challenged more efficient and just, and provide a training tool that would lead to better protection of constitutional rights.

137.    Mrs. Barnes and Jordan went a few days later to get a replacement license and no DUI charges or problems concerning DUI were found at the license office either.

138.    As a result of the short and long term injury, Jordan could not work, and could not make payments on his truck

139.    The shoulder is permanently injured and causes pain during use.

140.    Barnes suffered severe physical pain and mental anguish in the past, which he will, with reasonable certainty continue to suffer into the future.

141.    Before the challenged incident, Jordan could work as a laborer, in such jobs as landscaping.

142.    After the challenged injury Jordan can no longer do such work, due to the pain.

143.    Jordan's limited education, mental condition and speech impediment prevent him from being a candidate for other jobs less physically demanding.

Count I: False Arrest

144.    Plaintiff incorporates herein the Parties section and the Facts section.

145.    Barnes brings a Fourth Amendment false arrest claim against Defendant Smithwick and Defendant Brown for arresting and causing the arrest of Barnes without probable cause.

146.    No reasonable officer would have arrested Barnes under the circumstances because Smithwick and Barnes knew and should have known that Barnes had not been driving erratically, had repeatedly passed the tests given for driving under the influence, there was no other test performed, and his slurred speech was a speech impediment, not evidence of drunk driving.

147.    Barnes' truck was originally stopped allegedly because a shooting suspect was also driving a white truck, but Defendant Brown and Smithwick knew and should have known that Barnes was not the shooting suspect, because the suspect had a handgun and Barnes did not have a handgun, Barnes was at the scene with his mother to explain his circumstances and Barnes and his mother had had contact with dispatch and other officers during the day.

Count II Excessive Force for Smothering

148.    Plaintiff incorporates herein the Parties section and the Facts section.

149.    Barnes brings a Fourth Amendment excessive force claim against Defendant Smithwick for smothering Barnes' face with a towel.  To the extent Smithwick had a reason for smothering Barnes' face it was a cleanliness motivation so her car would not get blood stains on it.

150.    A reasonable officer would have left the windows partly rolled down so that Barnes did not feel suffocated in the car and foreseeably start protesting and trying to get the officer's attention. A reasonable officer would have folded the towel or applied it in such a way that it was only covering the cut, not the rest of Barnes' face and mouth. A reasonable officer would have called EMT instead of trying to wipe the blood from Barnes' face herself.

Count III Excessive Force related to Shoulder Injury

151.    Plaintiff incorporates herein the Parties section and the Facts section. Barnes brings a Fourth Amendment excessive force claim against Defendants Smithwick and Brown, because

Smithwick and Brown used an unreasonable amount of force when pushing Barnes back to the ground and injuring his shoulder, and because Smithwick and Brown unreasonably caused the circumstances that presented an increased risk of using excessive force against Barnes, when they ordered him out of the police car for no legitimate reason.

152.    A reasonable officer would have left Barnes in the car so that a situation would not arise such that force might be applied to Barnes.  A reasonable officer would have applied less force to keep Barnes on the ground.

Count IV: Supervisory and Entity Liability

153.    Plaintiff incorporates herein the Parties section, the Facts section, and Counts 1-111.

154.    Barnes brings a supervisory and entity liability claim against the Sheriff Clay Whittle, Captain Donna Dunham or the official in charge of the Columbia County Sherriff's office of professional standards as of the date of the Barnes arrest, and Columbia County, for causing the false arrest and excessive force used against Barnes.

155.    The claim against Columbia County is for injunctive relief only.  Whittle and Dunham knew and should have known that the policy and practice of the Columbia County Sherriff's office was to rubber stamp, i.e. approve questionable incident reports, based on what the officers stated in their reports without any independent evidence or investigation into holes or inconsistencies in the officers' statements.

156.    Defendants Whittle and Dunham are responsible for and caused the policy and practice of rubber stamping incident reports when any reasonable officer would know that there had to be investigations and independent evidence to deter officers from covering up their misconduct in their statements about it.  Because of this policy and practice, officers Brown and Smithwick knew that they could get away with an unlawful arrest and use of excessive force.

157.    Plaintiff asks the Court to require and order Columbia County to provide and require the use of dash cams in all vehicles and body cams, to protect the rights of all citizens under the Fourth and Fourteenth amendments from unlawful arrest, use of excessive force, and to allow meaningful review of the interaction of officers with citizens by supervisors and the judicial system in an efficient manner.

Count V: ADA against Columbia County Due to Arrest

158.    Plaintiff incorporates herein the Parties section and the Facts section.

159.    Barnes brings a claim under the ADA against Columbia County for arresting Barnes as discrimination against him because of his disability.

160.    Barnes was a qualified individual with a disability within the meaning of Title II of the ADA and met the essential eligibility requirements for the receipt of the law enforcement services, programs, and/or activities of St. Louis County Police Department.

161.    Barnes had two disabilities as defined by the ADA, one because of his speech impediment and another because of his mental condition including PTSD and anxiety, causing him to engage in self-harm and erratic behavior.

162.    Columbia County was a public entity within the meaning of Title II of the ADA, and provided to the general public law enforcement programs, services, and/or activities for which effective communication and an ability to remain in control and function normally was an integral part.

163.    Through its acts and omissions described herein, Defendant Columbia County has violated Title II of the ADA by excluding Barnes by reason of his disability from participation in and/or by denying him the benefits of the law enforcement services, programs, and/or activities the Columbia County Police Department provides to the general public.

164.    Through the acts and omissions of its agents and employees Columbia County subjected Barnes to discrimination on the basis of his disability in violations of Title II of the ADA by failing to provide him with communication that was as effective as communication provided to the general public in the following law enforcement situations: determining who to arrest and the use of force when arresting.

165.    On information and belief agents and employees of Columbia County committed the acts and omissions alleged herein intentionally and/or reckless disregard of Barnes' rights.

166.    As a direct and proximate result of these acts, Barnes sustained serious personal injuries.

167.    On information and belief the agents and employees of Columbia County have failed and continue to fail to: Train and supervise agents and employees of Columbia County to recognize and identify mentally ill persons; Train and supervise agents and employees of Columbia County to effectively communicate and interact with mentally ill persons, and; To adopt, implement, and enforce adequate policies and procedures to provide effective communication and interaction with mentally ill persons.

168.    Because the discriminatory conduct of agents and employees of Columbia County is ongoing, declaratory and injunctive relief are appropriate remedies.

169.    Pursuant to 42 U.S.C. § 12133, Barnes is entitled to injunctive relief and to recover damages and reasonable attorneys' fees and costs incurred in bringing this action.

170.    Columbia County violated the ADA because Barnes was arrested for legal, disability-related conduct, namely his slurred speech. The arrest was caused by discrimination against his disability in the form of slurred speech. Defendants Smithwick and Brown knew and should have known that Barnes' slurred speech was due to his disability, not alcohol.

Count VI: ADA against Columbia County for Manner of Force

171.    Plaintiff incorporates herein the Parties section, the Facts section, and Count V.

172.    Barnes brings an ADA claim against Columbia County for failure to accommodate his disability when seizing him with respect to the method of seizure and force used.

173.    Defendants Smithwick and Brown knew and should have known that Barnes had a qualifying disability, because they saw him injure himself by beating his head against the inside of the police car and acting erratically and because Jennifer Barnes told Brown about Jordan Barnes' mental condition. That information was readily available to Smithwick.

174.    Smithwick and Brown unreasonably caused the circumstances that presented an increased risk of using excessive force against Barnes, when they ordered him out of the police car for no legitimate reason.  A reasonable officer would have left Barnes in the car so that a situation would not arise such that force might be applied to Barnes.  A reasonable officer would have applied less force to keep Barnes on the ground.  A reasonable officer would have called EMT to handle Barnes in light of his mental condition and agitated state or at least deescalated the situation by trying longer to communicate with him, by not suffocating him with the towel, and by not ordering him out of the car where it is harder to control someone.

175.    Because of Barnes' disability he was denied the benefit of an orderly, peaceful, injury-free arrest that is usually available to the general public.

WHEREFORE, Plaintiff prays judgment against one or more Defendants, individually or jointly for the following:

a.      Compensatory damages as allowed by law;

b.      Special damages, as more particularly shown at trial;

c.      Damages for injuries caused by deprivation of Constitutional rights under the United

States Constitution;

d.      Punitive damages against each individual Defendant in their individual capacity;

e.      Reasonable attorney fees, costs and expenses of litigation under 42 U.S.C. § 1988 and 42

U.S.C. § 12132;

f.       Any other and further relief so ordered.

        A JURY TRIAL IS HEREBY REQUESTED.

        This the 26th day of June, 2017.

                                                  /s/ John P. Batson
                                                  John P. Batson
                                                  Ga. Bar No. 042150
                                                  Attorney for Plaintiff
                                                  P.O. Box 3248
                                                  Augusta, GA 30914
                                                  706-737-4040
                                                  FAX 706-7363391
                                                  jpbatson@aol.com

Prepared by:

John P. Batson
P.O. Box 3248
Augusta, GA 30914
706-737-4040